UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
—BROWNSVILLE DIVISION—

United States District Court
Southern District of Texas
ENTERED

JUN 17 2009

Michael N. Milby, Clerk of Court
By Deputy Clerk

| | |
|---|---|
| JULIO CESAR HERNANDEZ SALDANA § § *Plaintiff*, § § v. § § INTERNATIONAL SHIPBREAKING § LIMITED, LLC and THE UNITED § STATES OF AMERICA, § *Defendants*. § | CIVIL ACTION NO. B-07-160 |

## MEMORANDUM OPINION AND ORDER

Currently pending before the Court are two motions. The first is Defendant International Shipbreaking Limited, LLC's ("ISL") Motion to Dismiss Plaintiff Julio Cesar Hernandez Saldana's ("Saldana") claims for lack of subject matter jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(1), and in the alternative for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6) (DE 12). The second is the United States of America's (the "Government") Motion to Dismiss Saldana's claims for lack of admiralty jurisdiction under 28 U.S.C. § 1333, and in the alternative, for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(c) on the same ground (DE 16). Having considered the Defendants' motions, the record, and the relevant law, the Court is of the opinion that ISL's Motion should be denied, and the Government's Motion should be granted.

I.   **BACKGROUND**

The facts giving rise to this suit trace back to July 18, 2005 when ISL was awarded a contract by the U.S. Department of Transportation, Maritime Administration ("MARAD") to recycle and dispose of the former Naval Vessel, Ex-U.S.S. ALBERT J. MEYER ("MEYER"). The National

Defense Reserve Fleet consists of government-owned merchant-type vessels of 1,500 gross tons or more. *See Basel Action Network v. Maritime Administration*, 370 F. Supp. 2d 57, 61 (D.D.C. 2005). This includes the Ready Reserve Fleet, maintained in a state of readiness for national emergencies, and the Non-Retention Reserve Fleet, which consists of obsolete vessels (colloquially known as the Navy's "Mothball Fleet" or "Ghost Fleet"). *See id.* The National Maritime Heritage Act authorizes MARAD to dispose of these obsolete vessels in the event they are not acquired for use as artificial reefs or museums, like the USS ALABAMA which served in World War II in the Atlantic and Pacific Theaters (on display in Mobile Bay, Alabama). *See* 16 U.S.C. §§ 5401, *et seq.* Out of concern for the environmental risks of these aged vessels corroding in interstate waters and the costs of their maintenance, in 2001, Congress passed the National Defense Authorization Act, which among other things, appropriated funding and set a deadline of September 30, 2006 for MARAD to dispose of all obsolete vessels "in a manner that provides the best value to the Government...." 16 U.S.C. § 5405(c); *see also* 46 U.S.C. § 57102; *Basel Action Network*, 370 F. Supp. 2d at 61. It was in fulfillment of its obligation under that Act that MARAD contracted with ISL for the MEYER's disposal.

Pursuant to ISL's contract with MARAD, ISL caused the MEYER to be towed from the James River Reserve Fleet in Virginia, and moored at ISL's East dismantling slip on September 11, 2005. ISL's facility is located within the Port of Brownsville, Texas approximately 12 miles up the ship channel from the Gulf of Mexico. Dismantling work began soon after the MEYER arrived, the superstructure, or "the structural part of a ship above the main deck,"[1] was removed by November 19, 2005, and dismantling work was complete by February 10, 2006. *See* Govt's Mot. at 3. The

---

[1] MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1853 (Deluxe Ed. 1998).

Government stipulates that at all relevant times to this litigation, and since 1994, the MEYER was owned by MARAD. *See id.* Saldana's complaint avers the following circumstances surrounding his alleged injury aboard the MEYER.[2]

On October 19, 2005, approximately one month into the five-month long dismantling process, Saldana was working for ISL aboard the MEYER as part of the ship-breaking effort. *See* Pl.'s Compl. at 2. Defendants put Saldana to work in a portion of the ship which was unsafe or left unprotected and unsupported. *See id.* Due to Defendants' alleged negligence or gross negligence in putting Saldana to work in that portion of the ship, Saldana was struck and seriously injured by heavy doors, light fixtures, and other falling debris, which fell from the top, unsupported portion of the ship. *See id.* Saldana was thrown down to the floor injuring his arms, back, and stomach area, causing a severe hernia. *See id.* As a result, Saldana was hospitalized and received an operation which left a permanent scar. *See id.* He was prevented from working for months, suffered great pain and mental anguish, and to this day, continues to experience pain in his abdomen. *See id.* Shortly after returning to work at ISL, Saldana was fired. *See id.* Prior to his injury, Saldana alleges that he was strong, able-bodied, and capable of doing various kinds of labor and physical work, including lifting objects of different weights and sizes, but that now he can no longer lift as much weight, and is limited in the type of work he can perform. *See id.* Saldana requests relief from this Court in the form of a judgment against the Defendants, damages in the amount of $275,000, and costs of court. *See id.* at 3.

---

[2] The recited facts contained herein are merely gleaned from Saldana's Complaint (DE 2), and do not constitute findings of this Court.

## II. STANDARD OF REVIEW

A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the "pleadings, the discovery and disclosure materials on file, and any affidavits," which it believes demonstrate the absence of a genuine issue of material fact. FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once a movant makes a properly supported motion, the burden shifts to the nonmovant to demonstrate the existence of a genuine dispute. *See* FED. R. CIV. P. 56(e)(2). The nonmoving party "may not rely merely on allegations or denials in its own pleading;" rather, it must go beyond the pleadings and provide specific facts showing that there is a genuine issue of material fact for trial. *Id.*; *see also Celotex Corp.*, 477 U.S. at 324; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmoving party need not "produce evidence in a form that would be admissible at trial . . . [since ] Rule 56 does not require the nonmoving party to depose [his] own witnesses[; but rather,] permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in 56(c), except the mere pleadings themselves." *Celotex Corp.*, 477 U.S. at 324. The evidentiary materials listed in 56(c) include: "discovery and disclosure materials on file, and any affidavits show[ing] that there is no genuine issue as to any material fact." FED. R. CIV. P. 56(c); *see also Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 192 (5th Cir. 1991) ("answers to interrogatories, and admissions on file, together with affidavits, could suffice"). "A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." FED.

R. CIV. P. 56(e)(1). Finally, since credibility is not an issue on summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 248.

## III. DISCUSSION

### A. ISL's Motion for Summary Judgment[3]

#### 1. Federal Subject Matter Jurisdiction Exists Over Plaintiff's Claims against ISL

ISL first argues this Court lacks jurisdiction over Saldana's claims under Federal Rule of Civil Procedure 12(b)(1), authorizing federal courts to dismiss a suit based on a lack of subject matter jurisdiction. *See* FED. R. CIV. P. 12(b)(1). Saldana's Complaint alleges jurisdiction against ISL under the LHWCA generally, but does not indicate a specific section of that Act governs his claims. *See* Pl.'s Compl. at 2. However, in response to ISL's Motion, Saldana filed two sworn declarations. The second declaration states that ISL failed to compensate him for his injuries under the LHWCA, even though he filed a claim with the deputy commissioner.[4] *See* Pl.s' Resp. at 5

---

[3] Rule 12(d) of the Federal Rules of Civil Procedure states that if a motion to dismiss for failure to state a claim upon which relief can be granted presents "matters outside the pleading . . . , the motion shall be treated as one for summary judgment under Rule 56." FED. R. CIV. P. 12(d). ISL's initial Motion to Dismiss is purely a Motion to Dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure and does not present matters outside the pleading (DE 12). However, after Saldana filed a Response in Opposition to ISL's Motion to Dismiss including two sworn declarations, ISL filed a "Response to Saldana's Motion in Opposition to Defendants [sic] Motion to Dismiss and Its Motion for Summary Judgment" in which ISL did present "matters outside the pleadings;" namely, documents purporting to establish that Saldana's claims were barred by the doctrine of res judicata (DE 37). This Court considers both Saldana's sworn declarations and the materials relating to a res judicata defense presented by ISL in resolving ISL's Motion. Therefore, the Court construes ISL's Motion to Dismiss as one for Summary Judgment. *See Stewart v. Murphy*, 174 F.3d 530, 532-33 (5th Cir. 1999); *Baker v. Putnal*, 75 F.3d 190, 197 (5th Cir. 1996) (". . . where a district court grants a motion styled as a motion to dismiss but bases its ruling on facts developed outside the pleadings, we review the order as an order granting summary judgment"). As such, the Court conducts its analysis of the merits of ISL's Motion to Dismiss under the summary judgment standard codified in Federal Rule of Civil Procedure 56.

[4] While Saldana does not specify which deputy commissioner he filed his benefits claim with, the Court assumes for purposes of this Order only that Saldana properly filed his claim for LHWCA benefits with the Deputy Commissioner of the United States Department of Labor, according to the procedures set forth by the Secretary of that Department. *See* 33 U.S.C. § 919.

("Plaintiff's Declaration at __"). Therefore, this Court construes Saldana's claim against ISL to be a claim under § 905(a) of the LHWCA. Section 905(a) provides in relevant portion that "if an employer fails to secure payment of compensation as required by this chapter, an injured employee [ ] may elect to claim compensation under the chapter, or to maintain an action at law or in admiralty for damages on account of such injury or death." 33 U.S.C. § 905(a).

The Fifth Circuit has previously recognized that "there is federal question jurisdiction over claims against employers asserted under the LHWCA." *See Brown v. Forest Oil Co.*, 29 F.3d 966, 970 (5th Cir. 1984); *see also Roy v. Int'l Guards, Inc.*, No. H-06-3614, 2007 WL 1745325, at *1 (S.D. Tex. Jun. 15, 2007) (stating that "when a plaintiff's claim arises under § 905(a), federal question jurisdiction exists under the federal question statute"). ISL cites no authority for the counter proposition, and thus, has not otherwise shown that it is "entitled to judgment as a matter of law." *See* FED. R. CIV. P. 56(c); *Celotex Corp.*, 477 U.S. at 322. Therefore, this Court concludes that it has federal question jurisdiction under 28 U.S.C. § 1331 over Saldana's claim against his employer ISL under § 905(a) of the LHWCA.

    2.    <u>Plaintiff Alleges Facts Sufficient to State a Claim Under § 905(a)</u>

In the alternative, ISL argues Saldana's claim does not state a claim upon which relief can be granted. *See* FED. R. CIV. P. 12(b)(6). Specifically, ISL argues that "[t]he plain wording of Plaintiff's [ ] Complaint establishes that his exclusive remedy lies with the [LHWCA,] and that he does not possess the causes of action he alleges." *See* ISL's Mot. at 2. In support, ISL recites a portion of § 905(a) that reads: "[t]he liability of an employer prescribed in section 904 of this title shall be exclusive and in place of all other liability of such employer to the employee . . . ." 33 U.S.C. § 905(a).

The LHWCA was created to establish a no-fault compensation scheme for injured, non-seaman maritime workers. *See Norfolk Shipbuilding & Drydock Corp. v. Garris*, 532 U.S. 811, 818 (2001); *see also McLaurin v. Noble Drilling (US) Inc.*, 529 F.3d 285, 289 (5th Cir. 2008). The hallmark of the LHWCA, like most other mandatory workers' compensation regimes, is that it serves as a substitute, rather than a supplement, for tort suits. *Cf. White v. United States*, 143 F.3d 232 (5th Cir. 1998) (discussing the Federal Employees' Compensation Act). Accordingly, under the LHWCA, "an injured worker is ordinarily barred from bringing a civil action against his or her employer." *See Brown*, 29 F.3d at 970 (citing 33 U.S.C. § 905(a)). However, **when an employer fails to secure compensation** in accordance with § 932 of the LHWCA, § 905(a) provides that an employee or his legal representatives "**may** elect to claim compensation under the chapter, or to **maintain an action at law or in admiralty for damages on account of such injury** or death." 33 U.S.C. § 905(a) (emphasis added).

In this case, Saldana has set forth facts which, if proved, are sufficient to state a claim for relief under § 905(a). Saldana states that he was a non-seaman ship-breaker, injured on the job, and that his employer – ISL – failed to compensate him after he requested workers' compensation benefits under the LHWCA. *See* Pl.'s Compl. at 2; *see also* Pl.'s Decl. at 5 (asserting that "Plaintiff has filed his LHWCA claim which has been denied"). Ship-breakers are specifically listed among employees "engaged in maritime employment" and covered by the LHWCA. 33 U.S.C. § 902(3). Furthermore, compensation under the LHWCA is payable "irrespective of fault as a cause for injury." *Voight v. R.L. Eldridge Const. Inc.*, 422 F. Supp. 2d 742, 747 (E.D. Tex. 2006). Notably, ISL does not assert in either its Motion for Summary Judgment or Reply to Saldana's opposition brief that it compensated Saldana for his injuries, that Saldana does not qualify for LHWCA

compensation, or that Saldana's claim that he applied for benefits is not accurate. In fact, the record is void of any evidence refuting Saldana's claim that he was wrongfully denied compensation benefits under the LHWCA. This strikes the Court as odd, given that the LHWCA provides for severe monetary and criminal penalties for those employers who do not secure payment of compensation as required. *See* 33 U.S.C. § 938(a). Nonetheless, without any facts to establish that this suit is barred by § 905(a)'s exclusive liability clause, the Court hereby concludes that a genuine issue of material fact exists as to whether ISL secured compensation to Saldana as required by the LHWCA.

### 3.   Plaintiff's Claims are Not Barred Under the Doctrine of Res Judicata

ISL's reply also states that Saldana previously filed suit in federal district court under 42 U.S.C. § 1983 based on the same facts giving rise to this suit. *See* ISL's Reply at 2 (DE 37). According to ISL, since that previous suit was dismissed on the ground that Saldana's suit failed to state a claim upon which relief could be granted, this suit should be dismissed as barred by the doctrine of res judicata. *See id.* This objection is both procedurally and substantively unsound.

First, ISL should have made the objection by filing a motion for leave to file an amended motion to dismiss or motion for summary judgment, not by adding it as a new ground for relief in a reply brief. *See, e.g., Gillaspy v. Dallas Ind. Sch. Dist.*, No. 06-11204, 278 Fed. Appx. 307, at *7 (5th Cir. May 13, 2008) (stating that "[i]t is the practice of this court and the district courts to refuse to consider arguments raised for the first time in reply briefs") (citing *Peteet v. Dow Chem. Co.*, 868 F.2d 1428, 1437 (5th Cir. 1989)). Second, ISL should have provided the Court with authority supporting its claim. *See United States v. Stevens*, 487 F.3d 232, 242 n.1 (5th Cir. 2007) (inadequately briefed issues are deemed abandoned). Finally, even if the objection had been timely

raised and at least nominally supported, the prior order of dismissal was without prejudice and specifically stated that "Petitioner's complaint alleges a tort against a private concern more properly brought under the [LHWCA]." *Saldana v. Int'l Shipbreaking Ltd.*, No. B-07-CV-053 (S.D. Tex. Jun. 6, 2007) (order of United States District Judge Hidla G. Tagle adopting report and recommendation of United States Magistrate Judge Felix Recio to dismiss Saldana's § 1983 Complaint without prejudice); *see also* ISL's Reply, Ex.'s B and C. Under that order, Saldana was free to file the present suit under the LHWCA, as he did. Accordingly, to the extent it was even properly presented, the Court hereby concludes ISL's res judicata defense to Plaintiff's LHWCA claim is groundless as a matter of law. *See TGX Corp. v. Simmons*, 62 F.3d 666, 667 (5th Cir. 1995) (stating that a "judgement without prejudice does not operate as res judicata").

**B.     The Government's Motion for Summary Judgment[5]**

Saldana's claims against the Government necessarily rest upon this Court's exercise of admiralty jurisdiction. Federal admiralty jurisdiction flows initially from the Constitution, which extends federal judicial power "to all Cases of admiralty and maritime Jurisdiction." U.S. CONST., art. III, § 2; *see also Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 531-32 (1995). Pursuant to that power, Congress gave the district courts original and exclusive

---

[5] Although styled a "Motion to Dismiss and Motion for Summary Judgment," the Court will conduct an analysis of the merits of the Government's claims under the motion for summary judgment standard codified in Federal Rule of Civil Procedure 56(c) because: (1) the Government properly set forth the standards for both a motion to dismiss and a motion for summary judgment in its initial Motion (DE 16); (2) the Government presented the Court with evidence outside the pleadings in the form of affidavits and photograph exhibits; and (3) Saldana's response includes a sworn declaration that challenges the summary judgment evidence extrinsic to his pleadings, thus putting the summary judgment evidence at issue (DE 35) (arguing that the Government's own photographs tend to prove, rather than disprove, that the MEYER was a vessel at the time of his accident because "the photo [shows] the [MEYER] is sitting quite nicely on water"). *See* FED. R. CIV. P. 12(d) ("[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented . . ., the motion must be treated as one for summary judgment under Rule 56").

jurisdiction of "[a]ny civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled." 28 U.S.C. § 1333(1). Historically, the test for admiralty tort jurisdiction asked only whether the tort occurred on navigable waters. *See Grubart*, 513 U.S. at 531-32. If it did, admiralty jurisdiction existed; if not, admiralty jurisdiction did not exist. *Id.* The jurisdictional rule was changed, however, in three decisions of the Supreme Court aimed at clarifying the outer boundaries of maritime jurisdiction.[6] *Id.* at 532-33.

Today, the test for admiralty tort jurisdiction is two-pronged. It requires that the incident (1) occur on navigable waters, or if the injury is suffered on land, that the injury was caused by a vessel on navigable water, and (2) have a substantial relationship to traditional maritime activity. *See Grubart*, 513 U.S. at 533-34. The first prong is known as the "location test," and the second as the "connection test." *See id.* at 534. The connection test in turn consists of two inquiries. *See id.* at 538-39. First, the incident involved must be of a sort with "the potential to disrupt maritime commerce." *Id.* at 538. Elaborating on this inquiry, the Supreme Court stated that:

> [t]he first *Sisson* test turns, then, on a description of the incident at an intermediate level of possible generality. To speak of the incident [in *Sisson*] as 'fire' would have been too general to differentiate cases; at the other extreme, to have described the fire as damaging nothing but pleasure boats and their tie-up facilities would have ignored, among other things, the capacity of pleasure boats to endanger commercial shipping that happened to be nearby. We rejected both extremes and instead asked whether the incident could be seen within a class of incidents that posed more than a fanciful risk to commercial shipping.

*Id.* at 538-39. Second, the general character of the activity giving rise to the incident must show "a

---

[6] *Executive Jet Aviation, Inc. v. Cleveland*, 409 U.S. 249 (1972) (no admiralty jurisdiction where tort claims arose out of the wreck of an airplane that collided with a flock of birds and fell into navigable waters of Lake Erie); *Foremost Insurance Co. v. Richardson*, 457 U.S. 668 (1982) (conferring admiralty jurisdiction where tort claims arose out of collision of two pleasure boats in a navigable river estuary); and *Sisson v. Ruby*, 497 U.S. 358, (1990) (conferring admiralty jurisdiction over tort claims arising out of a fire, caused by a defective washer/dryer aboard a pleasure boat docked at a marina, that burned the boat, other boats docked nearby, and the marina itself).

substantial relationship to traditional maritime activity." *Id.* at 539. Under this inquiry, a court examines "whether a tortfeasor's activity, commercial or noncommercial, on navigable waters is so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply in the suit at hand." *Id.* at 539-40. Bearing in mind the foregoing standards, the Court will now proceed to apply *Grubart's* two-prong test for admiralty jurisdiction to this case.

   1. The Location Test

The United States Coast Guard regulations define "navigable waters" as "those waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce." 33 CFR § 329.4 (1986). The test of navigability in law is navigability in fact; that is, whether in its natural and ordinary condition a waterway is used, or is "susceptible of being used, in their ordinary condition, as highways for commerce . . . ." *The Daniel Ball*, 77 U.S. (10 Wall.) 557, 563 (1870); *see also Dardar v. Lafourche Realty Co., Inc.*, 55 F.3d 1082, 1085 (5th Cir. 1995) (applying navigability test set forth in *The Daniel Ball*).

In this case, Saldana's injuries were sustained while he was working aboard the MEYER, which was then sitting in ISL's East dismantling slip in the Port of Brownsville, accessible by a 17-mile long ship channel which is connected to the Gulf of Mexico by way of the Brazos Santiago Pass. *See Brownsville Nav. Dist. of Cameron County, Tex. v. St. Louis, B & M Ry. Co., et al.*, 91 F.2d 502, 504 (5th Cir. 1937) (noting Port of Brownsville ship channel created by dredging project from Brazos Santiago Pass on the Gulf of Mexico to the city of Brownsville), *rev'd on other grounds*, 304 U.S. 295 (1938). In support of its Motion for Summary Judgment, the Government

submitted the Declaration of Shaun Ireland, Supervisory Program Analyst in the Ship Disposal Program of MARAD. *See* Govt's Mot., Ex. A ("Ireland Aff. at ¶ __"). Attached to Ireland's affidavit are several photograph exhibits of the MEYER taken by Green Environmental Services, ISL's environmental, health, and safety consultant for the MEYER dismantling project. *See* Ireland Aff. at p. 6-10 ("GES photo #__, [date]"). These photographs conclusively demonstrate that the MEYER was, in fact, sitting in ISL's East dismantling slip – part of a navigable waterway – on the date of Saldana's alleged injury. *See* GES Photo #1 - 2, October 17, 2005 (showing the MEYER in a water-filled canal, secured by heavy-duty chain to shore, and two canoes floating along-side it underneath a caption reading "the [MEYER] has been pulled up onto the ISL dismantling slip ramp . . ."). On a more practical level, the fact that the MEYER was towed to ISL's facility from the James River Reserve Fleet in Virginia helps to establish that the destination canal is a waterway capable of use in interstate commerce. *See* Ireland Aff. at ¶ 7; *see also United States v. Lamastus & Assoc., Inc.*, 785 F.2d 1349, 1353 (5th Cir. 1986) (observing that "artificially constructed and privately owned waterways, **including canals**, are subject to federal regulatory authority if they are navigable in fact") (internal quotations and citation omitted; emphasis added). Accordingly, the Court finds the first type of location test is satisfied here because Saldana's alleged injury occurred on navigable waters. *See Grubart*, 513 U.S. at 534; *see also Scarborough v. Clemco Indus.*, 391 F.3d 660, 664 (5th Cir. 2004).

    2.    <u>The Connection Test</u>

As stated above, the connection test requires the incident involved to (1) have a potentially disruptive effect on maritime commerce, and (2) bear a substantial relationship to traditional maritime activity. *See Grubart*, 513 U.S. at 538-39. In this case, there is no question that ship-

breaking qualifies as an activity having a substantial relationship to traditional maritime activity. *Cf.* 33 U.S.C. § 903(3) (listing ship-breaker among types of employees "engaged in maritime employment"). The only question thus remaining is whether the events surrounding Saldana's injury aboard the MEYER "posed more than a fanciful risk to commercial shipping." *See Grubart*, 513 U.S. at 539.

In *Coats v. Penrod Drilling Corporation*, the plaintiff suffered a severe knee injury when a jack-up vessel's bullplug failed during a pressure test conducted while the vessel was sitting in the territorial waters of the United Arab Emirates. *See Coats v. Penrod Drilling Corp.*, 61 F.3d 1113, 1117 (5th Cir. 1995). In holding that this injury had a potentially disruptive impact on maritime commerce, the Fifth Circuit observed that "worker injuries, particularly to those involved in repair and maintenance, can have a disruptive impact on maritime commerce by **stalling or delaying the primary activity of the vessel**." *Id.* at 1119 (emphasis added). In particular, the worker's injury in *Coats* delayed, or at least had the potential to delay, the jack-up vessel from proceeding with its next offshore oil drilling operation. *See id.*

In this case, while Saldana's declarations raise a genuine factual dispute as to whether the MEYER was a dead ship or a vessel at the time of his alleged injury, both sides agree that the MEYER was moored at ISL's East dismantling slip off the Port of Brownsville ship channel, that it was being dismantled, and that the MEYER would never sail again. *See* Pl.'s Decl. at 2-3 (stating that "no one disputes that the MEYER was being permanent[ly] dismantled from service[; h]owever, the fact remains that at the time of the Plaintiff['s] injury the MEYER was not yet a dead ship"). Unlike the jack-up vessel in *Coats* which would return to its primary service as an offshore oil drilling rig following its pressure test, the MEYER had no "primary activity" to return to because

it was being permanently dismantled, recycled for scrap metal, and would never sail again as part of the Navy's Reserve Fleet. *See Coats*, 61 F.3d 1119; *see also* Ireland Aff. at ¶¶ 5 - 11. Accordingly, Saldana's injury had no potential to stall or delay any future activity of the MEYER. *See id.* Of course, this Court could conceive of different factual scenarios in which the falling debris aboard the MEYER might have caused a disruptive impact on maritime commerce. For instance, a potentially disruptive impact on maritime commerce certainly would have existed if the falling debris which allegedly struck Saldana had instead struck a storage tank of fuel or other flammable liquid aboard the MEYER and caused a massive explosion requiring all nearby activity in the Port of Brownsville to shut down while the fire department and other hazardous material responders regained control of the situation. However, this is precisely the sort of "fanciful risk to commercial shipping" that the Supreme Court cautioned courts not to entertain. *Grubart*, 513 U.S. at 538-539. Therefore, this Court concludes that the facts giving rise to Saldana's injury were not "of a sort with the potential to disrupt maritime commerce." *Id.* at 538. As such, this Court lacks admiralty jurisdiction over Saldana's claims against the Government under 28 U.S.C. § 1333(1).

## IV.   CONCLUSION

Saldana's claim against ISL for non-payment of compensation benefits under § 905(a) of the LHWCA arises under the laws of the United States, thereby vesting this Court with federal subject matter jurisdiction under 28 U.S.C. § 1331. It also states facts which, if proved, are sufficient to entitle him to relief under that same provision. Accordingly, ISL's Motion to Dismiss (DE 12), construed by this Court to be a Motion for Summary Judgment, is hereby DENIED.

Although Saldana's injury occurred on a navigable waterway of the United States while he was in the process of ship-breaking, a traditional maritime activity, the incident did not have the

potential to disrupt maritime commerce because the MEYER was in the process of being permanently dismantled, thereby preventing federal admiralty jurisdiction from reaching the facts of this case. Accordingly, the Government's Motion to Dismiss and Motion for Summary Judgment (DE 16), construed by this Court to be a Motion for Summary Judgment, is hereby GRANTED.

SIGNED this 17th day of June, 2009.

Andrew S. Hanen
United States District Judge